## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **URBAN OAKS BUILDERS LLC,** [1] | § | **Case No. 18-34892** |
| | § | |
| **Debtor.** | § | **Chapter 11** |

### DEBTOR'S PRELIMINARY RESPONSE TO SOUTHSTAR'S
### MOTION TO DISMISS THE CHAPTER 11 CASE
### (Relates to Doc. No. 83)

Urban Oaks Builders LLC, the above-captioned debtor and debtor in possession. ("**UOB**" or the "**Debtor**"), hereby files this Preliminary Response (the "**Response**") to Southstar Capital Group, I, LLC, Cottington Road TIC, LLC, and Durban Road TIC, LLC (collectively, "**Southstar**") Motion to Dismiss Chapter 11 Case (the "**Motion**") [Doc. No. 83], and in support hereof, respectfully states as follows:

### I. PRELIMINARY STATEMENT

1.     Relying upon nothing more than conclusory statements and obfuscation, Southstar moves this Court to dismiss UOB's Chapter 11 case for cause – alleging that UOB's case was filed in bad faith.  First and foremost, UOB denies any such bad faith in filing this Chapter 11 case. UOB filed this Chapter 11 case in good faith as a means to "assist [its] financially distressed business [enterprise] by providing [it] with a breathing space in which to return to a viable state."[2] Specifically, UOB filed this Chapter 11 case to allow the Debtor to provide continued uninterrupted service on its projects, ensure that its vendors and employees are paid without interruption, continue to fully defend itself on the claims asserted by Southstar, and to pursue its

---

[1] The Debtor in this Chapter 11 case and the last four digits of the Debtor's federal tax identification number are: Urban Oaks Builders LLC (8662).

[2] *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) (quoting *Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) (citing *In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 922 (Bankr. N.D. Ill. 1982).

rights under its various commercial general liability insurance policies.  UOB in no way sought to hinder or delay creditors or otherwise misuse the bankruptcy process.

2.      Southstar has alleged no fact or circumstances that challenges these motivations. Southstar alleges that UOB's bankruptcy constitutes a bad-faith filing because (1) UOB lacks any real need to reorganize; and (2) the bankruptcy was filed to gain a litigation advantage in both the Southstar and Coverage litigations.  Significantly, Southstar admits that the mere fact that a bankruptcy filing creates a litigation advantage is not enough to evidence bad faith.[3] Instead, Southstar argues that, because UOB is not in any "real" financial distress, the bankruptcy case was filed solely to forum shop or as a litigation tactic.  But the facts are that UOB **is** facing financial distress caused by the underlying Southstar litigation and related insurance coverage disputes.  As Southstar's own Motion acknowledges, UOB's managing member was not willing to continue funding litigation costs for UOB unless this Chapter 11 case was filed.[4]  Absent such funding, which UOB's managing member is not obligated to provide, UOB is unable not only to fund these litigation costs but also incapable of continuing to perform on its three ongoing construction projects.

3.      Southstar's argument that UOB's financial distress is not "real" is predicated on Southstar's assertion (without presenting a single supporting fact) that UOB is a "pass-through entity" for the "Hines Entities."  In other words, Southstar's entire theory of bad faith rests upon its claim that the "Hines Entities" should be *compelled* to continue funding UOB's litigation and operation costs, because the "Hines Entities" and UOB are allegedly alter-egos of one another. Southstar's position in this regard and its Motion are completely devoid of any facts that establish a plausible alter-ego type claim.  Accordingly, Southstar has failed to adequately plead a basis for

---

[3] Motion ¶ 26, p. 14. (quoting *Investors Group v. Pottorff*, 518 B.R. 380, 384 (N.D. Tex. 2014).

[4] *Id.* ¶ 30, p. 16.

alleged bad faith or any other cause for dismissal of this bankruptcy, and as such, the Motion should be denied.

## II.   <u>BACKGROUND</u>

### A.   <u>Procedural History</u>

4.      On August 31, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

5.      Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtor is operating its business and managing its property as a debtor in possession.

6.      The Debtor is a general contracting and construction management company formed in 2011.  It is in the business of providing general contracting and construction management services for large and medium-sized multifamily residential construction projects across the United States.  The Debtor provides services primarily for entities affiliated with Hines Interests Limited Partnership ("**HILP**").

7.      The Debtor's principal office is in Houston, Texas, and most of its employees and officers are likewise located in Texas.

8.      The Debtor is currently the general contractor for three large multifamily projects, located in Denver, San Antonio, and Houston.  Each project is based on a guaranteed maximum price contract, with contract values of approximately $67 million, $52 million, and $112 million, respectively.

9.      Although the Debtor operated profitably from 2011 to 2017, beginning in 2017, it began to incur substantial expenses and costs in connection with the claims brought by Southstar regarding alleged construction defects at a multifamily apartment project for which the Debtor was the general contractor in Celebration, Florida. Several of the Debtor's insurance carriers have

refused to cover, defend and indemnify the Debtor against Southstar's claims.  Because of the insurance carriers' failure to comply with their contractual obligations, the Debtor has filed a declaratory judgment action against them which is currently pending in the Middle District of Florida. To finance these litigation expenses and ensure the Debtor's continued operations, the Debtor's managing member, POC Holdings 2, Inc. (the "**Prepetition Secured Lender**"), made several loan advances to the Debtor.

10. While the Debtor continues to earn sufficient cash-flow from its active construction projects to pay its ordinary debts and obligations as they come due, the Debtor lacks sufficient cash reserves to continue to finance the ongoing litigation over construction defects at the Celebration Apartments without further advances from the Prepetition Secured Lender.  In addition to the prepetition loans from the Prepetition Secured Lender, the Debtor also has obligations to its vendors, employees, HILP, and other parties, including the asserted unliquidated and disputed claims of Southstar and its affiliates.  To allow the Debtor to provide continued uninterrupted service on its projects, ensure that its vendors and employees are paid without interruption, continue to fully defend itself on the claims asserted by Southstar, and to pursue its rights under its various commercial general liability insurance policies, the Debtor chose to file this Chapter 11 bankruptcy case.  The Debtor believes that the breathing spell provided by the Chapter 11 filing will allow it an opportunity to manage its defense costs and pursue its insurance coverage while continuing its operations without interruption.

**B.**     **The Southstar Dispute**

11.     As noted above, as of the Petition Date, the Debtor was engaged in litigation initiated by Southstar stemming from alleged construction defects at the Celebration Apartments that the Debtor built.  Given the significance of the Celebration project and the Southstar dispute additional factual detail is set forth below.

     i.     **1662 Multifamily hires the Debtor to construct a multifamily apartment project and sells the project to Southstar**

12.     In July of 2014, the Debtor contracted with 1662 Multifamily LLC ("1662 Multifamily") for the construction of the Celebration Apartments.

13.     The Celebration Apartments consist of six identical four-story residential apartment buildings and a clubhouse, with a total of 306 residential units.  Each of the apartment buildings features L-shaped cantilevered balconies supported by three cantilevered beams on the second through fourth floor corner apartment units, with smaller rectangular cantilevered balconies on the "interior" units.

14.     The Debtor completed the Celebration Apartments in March 2016.  Later that year, 1662 Multifamily sold the Celebration Apartments to Southstar through an Agreement of Sale and Purchase dated July 1, 2016.  The Debtor was not a party to this transaction, and as the sale was on an "as-is where-is" basis, no warranty was given by the Debtor to Southstar in connection with the sale.  Further, UOB's construction contract with 1662 Multifamily was not assigned to Southstar by 1662 Multifamily.

     ii.     **Southstar notifies the Debtor and 1662 Multifamily that the corner balconies are deflecting downwards, the Debtor begins repairs, and the County yellow tags the Apartments.**

15.     In February 2017, Southstar Management, I LLC ("**Southstar Management**"), an affiliate of Southstar, notified the Debtor that some of the cantilevered corner balconies of the Celebration Apartments were deflecting downward.  The Debtor, the architect and engineer of record for the Celebration Apartments then inspected the situation and determined that the balconies needed to be shored and supported to prevent further movement, the balcony structure exposed, and new structural supports installed, at which time the temporary shoring could be removed, and the affected units reoccupied.  The Debtor began performing the work to stabilize and repair the corner balconies in May 2017.

16.     While the Debtor was performing this work, the Osceola County Building Department (the "**County**") posted a Notice of Evacuation at the Celebration Apartments on August 14, 2017 stating that the buildings were unsafe to occupy and requiring that the buildings be vacated within 30 days.  Instead of seeking to challenge the County's Notice of Evacuation, Southstar immediately ordered all residents to vacate the buildings within 30 days and began terminating leases.  Notably, the County did not follow its own ordinances requiring notice and hearing before issuing an evacuation order, and the County only provided minimal supporting reasons for its decision.

17.     Southstar refused to take any action to challenge the Notice of Evacuation despite receiving two reports prepared by a forensic engineering consultant, WJE, and sealed by a Florida registered professional structural engineer, stating that in their professional engineering opinion the Celebration Apartments were safe to occupy.

###### iii.     **The parties' attempts to reach a negotiated resolution fail due to Southstar's demands for a "like new" building.**

18.     Instead of seeking to challenge the yellow tag, on September 26, 2017, Southstar sent the Debtor and 1662 Multifamily a demand, setting forth three proposed options regarding the Celebration Apartments: (1) to buy the Celebration Apartments back for the price Southstar paid; (2) to fix all claimed deficiencies that Southstar identified (such that the buildings would be placed in an "as new" condition); or (3) to litigate.

19.     On September 28, 2017, Southstar provided the Debtor with a draft report prepared by Karins Engineering Group, Inc., which purported to identify numerous construction defects at the Celebration Apartments unrelated to the corner balconies.  Southstar provided this report (without any changes from the draft) to the County on October 6, 2017.

20.     During the fall and winter of 2017-2018, the Debtor continued with the work to stabilize and repair the cantilevered corner balconies and the parties attempted to negotiate a

resolution of the issues at the Celebration Apartments.  In total, the Debtor spent over $2.3 million to repair and resolve the issues.

21.     The efforts at a negotiated resolution failed, and in February 2018, Southstar filed suit against the Debtor and 1662 Multifamily, Hines 1662 Multifamily LLC, Hines Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, HILP, and JCH Investments, Inc. (together, the "**Other Defendants**") alleging alter ego liability of the Debtor and the Other Defendants and asserting claims against all of them for: (a) defective construction based on negligence and claimed violations of the Florida Building Code; and (b) fraudulent non-disclosure/fraudulent inducement.

22.     Southstar has alleged that the cost to repair the allegedly defective work and resulting damages (including lost rent allegedly caused by a need to vacate the apartments resulting from the defective work) total to over $45,000,000.  These potential liabilities increase further with each passing month, at a rate of $451,000, based on the lost rent claim alone.

iv.     **The Debtor's insurance carriers refuse to defend, and the Debtor brings a declaratory judgment action against them.**

23.     These liabilities were magnified by the conduct of the Debtor's insurers, which gave rise first to a declaratory judgment action by the Debtor against them and give rise now to this Chapter 11 filing.

24.     With respect to the Celebration Apartments, the Debtor and the Other Defendants are the named insureds on several commercial general liability insurance policies with Gemini Insurance Company ("**Gemini**"), Ironshore Specialty Insurance Company ("**Ironshore**"), Navigators Specialty Insurance Company ("**Navigators**") and Great American Assurance Company ("**Great American**" and collectively the "**Insurance Carriers**").

25.    Gemini's commercial general policy is the primary policy.  Ironshore's policy is the first layer of excess.  Navigators' policy is the second layer of excess.  Great American's policy is the third layer of excess.

26.    These insurance policies were issued as part of a property damage and general liability policies under a contractor-controlled insurance plan ("**CIP**") which provided general liability coverage for the Debtor, the Other Defendants, and the Debtor's subcontractors for their work on the Celebration Apartments.

27.    The CIP acts as a single policy that covered construction of the entirety of the Celebration Apartments and obligates the Insurance Carriers to cover the Debtor and the Other Defendants for liability and property damage, including as alleged in Southstar's lawsuit.  In total, the policies issued by the Debtor's insurance carriers cover most, if not all, of Southstar's alleged damages in their suit against the Debtor and the Other Defendants.

28.    One of the primary understood purposes of controlled insurance programs is to provide a "unified" defense for the project participants, avoiding disputes between the developer, contractor, and subcontractors who are involved in the controlled insurance program and the necessity of the contractor and developer pursuing indemnity and defense claims against the subcontractors.  When any party to a controlled insurance program is required to pursue its defense pursuant to an indemnity claim, there is a threat of diminished limits.

29.    Upon learning of Southstar's claims in February 2017, the Debtor promptly provided notice to the Insurance Carriers.  Throughout 2017 and the first half of 2018, the Debtor provided the Insurance Carriers with extensive information about Southstar's claims and repeatedly demanded that the Insurance Carriers defend and indemnify the Debtor.

30.    Instead of complying with their obligations under the CIP policies, the Insurance Carriers became embroiled in disputes with each other over which carrier was responsible for the

defense against Southstar's claims.  To date, the Insurance Carriers have refused to fully provide coverage for and defend and indemnify the Debtor or the Other Defendants against the claims asserted by Southstar.  As a result, the Debtor and the Other Defendants filed a lawsuit against Gemini, Ironshore, and Navigators in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida, styled *Hines Interests Limited Partnership, et. al. v. Southstar Capital Group I, LLC*, *et. al*., Case No. 2018-CA-01845 seeking a declaratory judgment requiring them to honor their obligations to the Debtor in relation to Southstar's claims.

31.     Because of the potential liabilities relating to the Southstar litigation, the rising litigation cost, and the uncertainty caused by the Insurance Carriers' unwillingness to defend and indemnify UOB and the Other Defendants as required by law, the Debtor filed this Chapter 11 bankruptcy case.[5]

## III.  RESPONSE

32.     Given the potentially significant expense to the estate in defending against a motion to dismiss, the complete lack of any factual basis for such a motion in this matter and the applicable legal standards relating to Southstar's allegations of alter ego liability as relates to the Debtor and the Hines Entities, this Court can and should deny Southstar's Motion in summary fashion for failure to adequately plead a plausible claim to relief.

## A.     Standard for Pleading in Contested Proceedings

33.     In contested matters, relief is sought by motion.[6]  The content of such motions is governed under Bankruptcy Rule 9013, which requires a motion to state both the relief sought and

---

[5] Per this Court's order, the Debtor, Southstar and the Insurance Carriers participated in a mediation on November 12, 2018.  As noted in the mediator's report [Doc. No. 148], the mediation was adjourned.  No settlement has been reached at this time.

[6] FED. R. BANKR P. RULE 9014(a).

the grounds therefor "with particularity."[7]  Though sometimes stated as a flexible standard, giving discretion to the Bankruptcy Court, the standard is not without teeth.  Courts interpreting Rule 9013's "with particularity" have found such to be analogous to the standard required for pleading fraud under Federal Rule of Civil Procedure 9(b), which also include the standards set forth in Rule 8 of the Federal Rules of Civil Procedure.[8]

34.      Applying the standards for Rule 8 requires a "[a] proper motion [to] contain factual allegations concerning the various requirements necessary for the relief being sought. Conclusory allegations or a mechanical recitation of those elements will not suffice; the motion should allege facts supporting those conclusions or satisfying those elements.  In other words, the movant should plead the essential facts that it expects [to] prove at trial: facts that, if true, would make a *prima facie* showing that it is entitled to the relief it seeks."[9]  In other words, the factual detail pled must establish a plausible claim to the relief sought.[10]

35.      The failure to meet these standards should result in denial of the relief sought -- even if such motion is unopposed.[11]  Applying these standards  to the Motion at hand, it is clear

---

[7] FED. R. BANKR P. RULE 9013; *In re White*, 409 B.R. 491, 493 (Bankr. N.D. Ind. 2009).

[8] *See In re White*, 409 B.R. 491, 494 (Bankr. N.D. Ind. 2009) ("[…] if such allegations will not satisfy the requirements of Rule 8 they will not satisfy the more rigorous requirements of Rule 9(b)").

[9] *Id.* (citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009)).

[10] *See, e.g., Elliott v. PHH Mortg. Corp.*, No. 15-CV-01221(BKS), 2017 U.S. Dist. LEXIS 131885, at *10-11 (N.D.N.Y. Mar. 3, 2017) (affirming denial of motion to enforce automatic say because motion contained nothing more than "bare legal conclusions); *In re White*, 409 B.R. 491, 493 (Bankr. N.D. Ind. 2009). (denying relief because, even when all of the motion's allegations were taken as true, it failed to allege the facts necessary to entitle the mortgagee to the relief sought, because the motion lacked the particularity required by Fed. R. Bankr. P. 9013); *In re Weatherford*, 434 B.R. 644, 646 (Bankr. N.D. Ala. 2010) ("Pleadings in contested matters that simply state bare legal conclusions or merely recite the elements of the movant's cause of action that are not supported by any factual allegations will not suffice under Rule 9013's pleading with particularity requirement."); *In re Hall*, No. 04-09478-JW, 2007 Bankr. LEXIS 3888, at *1 (Bankr. D.S.C. Nov. 21, 2007) (denying motion for relief from the automatic stay because motion failed to provide opposing party with meaningful opportunity to respond); *In re Sexton*, No. 07-40621, 2008 Bankr. LEXIS 353, at *1 (Bankr. N.D. Ind. Jan. 11, 2008) (denying motion to avoid judicial liens because motion lacked sufficient facts for the court to determine whether alleged liens actually impaired a claimed exemption).

[11] *See In re Auld*, 543 B.R. 676, 681-82 (Bankr. D. Utah 2015) ("Although the lack of opposition warrants granting a meritorious motion, courts are obligated to review motions for sufficiency. . .  Sufficiency is evaluated

that Southstar has not (and cannot) plead facts that support its alter-ego theories.[12]  Lacking such facts, Southstar's Motion does not state a plausible claim to relief, and the Motion should be denied.[13]  As noted by the Bankruptcy Court in *In re Weatherford*, "Bankruptcy is a national practice and creditors sometimes do not have the time or economic incentive to be represented at each and every docket to defend against entirely deficient pleadings.  Likewise, debtors should not have to defend against facially baseless or conclusory claims."[14]  Thus, because Southstar has not adequately plead a plausible alter-ego theory, its motion should be denied summarily.

**B.      Southstar's Motion is Not Adequately Pled.**

36.      Southstar argues that UOB is a financially sound enterprise not in financial distress and, accordingly, its bankruptcy case is nothing more than a litigation tactic.  As has been noted already, the bulk of Southstar's argument rests upon the ***assumption*** that UOB is dominated and controlled by 1662 Multifamily and the Other Defendants to which the Southstar refers as the "Hines Entities" (an ill-defined term seemingly referring to any and all entities allegedly affiliated with HILP) such that UOB should be deemed an "alter-ego" of the Hines Entities.

37.      Southstar's alter ego-claim is not supported by any factual allegations of significance; instead, Southstar implicitly asks the Court to presume that because "UOB has no secured debt other than amounts owed to its managing member, POC Holdings 2, Inc., an affiliate

---

according to Rule 9013, which states that a request for an order is made by motion or application, and the 'motion shall state with particularity the grounds therefor.")

[12] *See, e.g., In re Spikner*, No. 03-12901-WRS, 2004 Bankr. LEXIS 2226, at *11-12 (Bankr. M.D. Ala. Sept. 14, 2004). "[S]atisfying [the rule] requires much more information than [] simple notice pleading." *In re White*, 409 B.R. 491, 493 (Bankr. N.D. Ind. 2009). Instead, "the movant must allege facts indicating that some kind of cause exists" for the motion. *Id*. at 494-95; *see also In re Weatherford*, 434 B.R. 644, 646 (Bankr. N.D. Ala. 2004) ("apply[ing] the standard of pleading set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 . . . (2004) to contested matters").

[13] Where a movant relies upon nothing more than bare legal assertions without factual support, such motion is appropriately denied. *Elliott v. PHH Mortg. Corp.*, No. 15-CV-01221(BKS), 2017 U.S. Dist. LEXIS 131885, at *10 (N.D.N.Y. Mar. 3, 2017).

[14] 434 B.R. at 649-50.

of Hines Entities"[15] and because "UOB utilizes Hines Interests Limited Partnership 'for certain administrative services such as information technology, human resources, cash management, risk management and accounting,'"[16] alter-ego should be established. These allegations alone, however, are insufficient to establish a plausible claim for relief.

      i.    **In deciding whether to disregard UOB's corporate form, the Court should apply Delaware law.**

    38.    "Federal courts sitting in Texas must apply the law of the state of incorporation when a corporation's internal affairs are implicated."[17] UOB's state of incorporation is Delaware. Accordingly, Southstar's alter-ego type claims must be analyzed under Delaware law.

    39.    "Delaware law supports the availability of veil piercing, *although only in exceptional cases*, as equitable relief to avoid injustice" (emphasis added).[18] "Persuading a Delaware court to disregard the corporate entity is a difficult task."[19] To pierce the corporate veil of UOB, Southstar must allege facts that  (1) demonstrate another entity's "complete domination and control" of UOB to such an extent that UOB "no longer has legal or independent significance of its own," i.e. that UOB is an alter ego of another entity; ***and*** that (2) the corporate structure caused "fraud or similar injustice."[20] "Effectively, the corporation must be a sham and exist for no

---

[15] Motion ¶ 18, p. 9.

[16] *Id.*

[17] *ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 69 (S.D. Tex. 2007) (citing *Sommers Drug Stores Co. Employee Profit Sharing v. Corrigan*, 883 F.2d 345, 353-354 (5th Cir. 1989)(relying on TEX. BUS. CORP. ACT ANN. art 8.02 (Vernon 2003).

[18] *Id.*at 68. (*citing Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 43 Del. Ch. 516, 239 A.2d 629, 633 (Del. Ch. 1968); *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995)).

[19] *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999).

[20] *Id.*

other purpose than as a vehicle for fraud."[21]   Southstar has not, because they cannot, plead facts that would satisfy either prong of the Delaware test.

      ii.   **Southstar have not pled sufficient facts to show that UOB is the alter ego of another entity.**

     40.     Under Delaware law, determining whether one entity is the alter ego of another is a multifactor test where "no single factor is dominant."[22] Relevant factors include "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder."[23]

     41.     Here, Southstar has not alleged facts supporting alter-ego liability based on any of these factors.  Instead, Southstar simply lumps UOB, 1662 Multifamily, and the Other Defendants together, referring to them as "Hines Entities,"[24] and alleges that UOB's managing member is "an affiliate of Hines Entities."[25]   Southstar claims then that this affiliation somehow equates to the Debtor not being in financial distress.  Notwithstanding whether such an affiliation would render the Debtor solvent, Southstar does not allege any facts that identify how or when any of these entities allegedly dominated and controlled UOB to the extent that UOB no longer had any independent significance.  Indeed, Southstar seems to rely solely upon its assertion that UOB's managing member is allegedly "an affiliate of Hines Entities" as justification to ignore the

---

[21] *Id.*

[22] *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. Jul. 1, 2005).

[23] *Id.* (quoting *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del. 1988)).

[24] Motion ¶ 7, p. 5.

[25] *Id.* at ¶ 18, p. 9.

corporate distinctness of each defending entity. Such allegation, even if taken as true, is insufficient to establish alter-ego, as Delaware law specifies that common ownership, without other facts, is not enough to pierce the corporate veil.[26]

42.  Ultimately, all that Southstar has done is allege the existence of a network of related, but distinctly separate, corporate entities and attempted to apply an alter-ego theory globally as result of nothing more than alleged common ownership. Such allegations are not sufficient to establish a plausible claim for relief.[27]

### iii.  Southstar has not pled sufficient facts to show that the UOB corporate structure furthers a fraud or similar injustice against creditors.

43.  Even if Southstar's allegations were sufficient to establish that UOB is the alter ego of another entity (which they are not), "[t]o state a 'veil-piercing claim,' the plaintiff must also plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."[28] Stated differently, Plaintiffs must allege facts that if taken as true demonstrate that UOB's corporate structure causes "fraud or similar injustice."[29] Southstar has not done so. Thus, even if common ownership were sufficient to establish UOB as an alter-ego of the "Hines Entities," piercing the corporate veil would not be proper. Ultimately, because Southstar has not and cannot plead facts showing that UOB's corporate structure has been used to perpetuate a fraud, then Southstar's claim that UOB is not financially distressed because its affiliates have available resources fails.

---

[26] *See Trustees of Village of Arden v. Utility Const. Co.*, 2000 WL 130627, at *4 (Del. Ch. Jan. 26, 2000) ("The undisputed fact that [the entity which owned the project] and [the general contractor that contracted with the owner to build the project] have similar ownership is not sufficient to justify disregarding their business forms.").

[27] *See In re The Heritage Organization, L.L.C.*, 413 B.R. 438, 514-15 (Bankr. N.D. Tex. 2009) (applying Delaware law, "the Trustee seeks the global application of alter ego to all of the Entity Defendants so as to collapse the entire Kornman-controlled empire into Kornman, thereby making all of those entities (including Kornman) liable for Heritage's debts, along with whatever debts each of those other entities has, if any, in its own right. However, from the Court's perspective, the alter ego theory relied upon by the Trustee does not work on such a global basis.").

[28] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).

[29] Wallace, 752 A.2d at 1183.

## IV.  **CONCLUSION**

44.      Applicable pleading standards require Southstar to plead a claim for relief that is plausible on its face.  As Southstar's Motion rests almost entirely upon its theory that UOB should be treated as an alter-ego of the "Hines Entities," Southstar must, but has not, plead facts supporting this alter-ego theory.  In its Motion, however, Southstar makes little to no effort to define the "Hines Entities" nor has Southstar set forth specific facts that would support a claim that the "Hines Entities" have acted in such a way as to warrant a complete disregard for their corporate form.  In sum, Southstar has failed to plead any facts that would establish a plausible alter-ego theory.  Without such, as Southstar acknowledges, it cannot establish bad-faith or any other cause to dismiss this chapter 11 case.  Given these failures, this Court should summarily deny the Motion and save the Debtor's estate the cost and expense of defending Southstar's baseless Motion.

## V.  **RESERVATION OF RIGHTS**

45.      The Debtor reserves the right to respond further to the Motion on any and all additional factual or legal grounds.  Without limiting the foregoing, the Debtor specifically reserves its rights to amend this Response, file additional papers in support of this Response, file a subsequent response, respond to any allegation or defense that may be raised in response to the Response, and further respond based on any additional information that may be provided to the Debtor.

## VI.  **PRAYER**

WHEREFORE, the Debtor respectfully requests that the Court enter an order denying the Motion to Dismiss the Chapter 11 Case submitted by the Southstar at Docket No. 83, and for such other and further relief as the Court may deem just and proper.

Respectfully submitted on this 20th day of November 2018.

**OKIN ADAMS LLP**

By:     /s/ *Matthew S. Okin*
        Matthew S. Okin
        Texas Bar No. 00784695
        mokin@okinadams.com
        David L. Curry, Jr.
        Texas Bar No. 24065107
        dcurry@okinadams.com
        Ryan A. O'Connor
        Texas Bar No. 24098190
        roconnor@okinadams.com
        1113 Vine St., Suite 240
        Houston, Texas 77002
        Tel: 713.228.4100
        Fax: 888.865.2118

**ATTORNEYS FOR THE DEBTOR**